IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

ROGER WALL,

    Plaintiff,

v.                                            CIVIL ACTION NO. 2:20-cv-00460

ANDREW SAUL,
Commissioner of Social Security,

    Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Roger Wall ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on July 7, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's brief in support of his social security appeal (ECF No. 15) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 16).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY**

Claimant's request to reverse the Commissioner's decision (ECF No. 15), **GRANT** the Commissioner's request to affirm his decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

### I. BACKGROUND

*A. Information about Claimant and Procedural History of Claim*

Claimant was 47 years old at the time of his alleged disability onset date and 50 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 287, 293.)[1] He completed two years of college. (*Id.* at 317.) He has previously been employed as a customer service representative at a call center. (*Id.* at 318.) Claimant alleges that he became disabled on January 25, 2017, due to degenerative disc disease, sciatica, anxiety, depression, type two diabetes with neuropathy in both feet, ischemic optic neuropathy, scoliosis, and spondylolithesis. (*Id.* at 316–17.)

Claimant filed his DIB application on April 18, 2017, and protectively filed his SSI application on June 22, 2017. (*Id.* at 19, 287–90, 293–301.) His claims were initially denied on October 16, 2017, and again upon reconsideration on February 8, 2018. (*Id.* at 188–209, 211–24.) Thereafter, on March 12, 2018, Claimant filed a written request for hearing. (*Id.* at 225–26.) An administrative hearing was held before an ALJ on May 31, 2019, in Huntington, West Virginia. (*Id.* at 60–97.) On July 24, 2019, the ALJ rendered an unfavorable decision. (*Id.* at 16–38.) Claimant then sought review of the ALJ's decision by the Appeals Council on July 30, 2019. (*Id.* at 283–86.) The Appeals Council denied his request for review on May 13, 2020, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–7.)

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 14.

Claimant timely brought the present action on July 6, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 13) and a transcript of the administrative proceedings (ECF No. 14). Claimant subsequently filed his brief in support of his social security appeal (ECF No. 15), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 16). Claimant also filed a reply. (ECF No. 17.) As such, this matter is fully briefed and ready for resolution.

B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

1. *Mental Health Treatment During Relevant Period*

On April 13, 2017, nearly three months after his alleged onset date, Claimant presented to his primary care physician and reported that he was "doing fair" and denied psychological symptoms. (Tr. at 645, 647.) He again denied psychological symptoms at his next appointment on July 20, 2017, but his primary care physician noted that his mood was depressed and anxious. (*Id.* at 641, 643.) He referred Claimant to a psychiatrist. (*Id.* at 638.) At his next appointment with his primary care physician on August 29, 2017, Claimant reported that he had scheduled an appointment with the psychiatrist, but he denied psychological symptoms that day. (*Id.* at 754, 757.)

Claimant presented to a psychiatrist to establish care on October 11, 2017. (*Id.* at 715.) He reported a history of major depressive disorder and anxiety disorder for which his primary care physician prescribed him medications that "have helped marginally." (*Id.* at 717.) He related symptoms of difficulty sleeping, decreased energy, concentration,

3

and appetite, increased anxiety and worry, feelings of helplessness and hopelessness, and irritability. (*Id.*) A mental status examination was largely normal, except the psychiatrist observed that Claimant had "fair" judgment and insight. (*Id.*) The psychiatrist suspected that Claimant "has untreated obstructive sleep apnea and this could be mastering his depressive symptoms," so he referred Claimant "for a polysomnogram to evaluate and treat this disorder prior to adjusting medications." (*Id.*) The sleep study was conducted on November 2, 2017, and Claimant was diagnosed with mild sleep apnea. (*Id.* at 777.)

At his November 7, 2017 follow-up appointment with the psychiatrist after the sleep study, the psychiatrist's nurse practitioner explained, "Treatment of the sleep apnea will reduce his depressive symptoms and increase energy levels and medication may be reduced after this." (*Id.* at 725.) Upon mental status examination, Claimant had a depressed mood, restricted affect, and fair insight and judgment. (*Id.*) He was directed to return for a follow-up appointment after he had been fitted for a CPAP machine. (*Id.*) Claimant's primary care physician observed that his mood was depressed at his appointment on November 16, 2017, although Claimant denied psychological symptoms that day. (*Id.* at 763, 765.)

On February 1, 2018, Claimant presented to a nurse practitioner in his psychiatrist's office and "addressed desire to turn over management of his depression to our office." (*Id.* at 837.) He stated that he "feels that his depression is not properly managed" and was worsening. (*Id.*) He also reported difficulty using his CPAP machine. (*Id.*) A mental status examination was normal aside from fair insight and judgment. (*Id.*) The nurse practitioner prescribed an additional antidepressant but directed Claimant to continue taking the medications his primary care physician had prescribed. (*Id.* at 838.) At his next appointment with his primary care physician on February 22, 2018, Claimant

4

complained that he "doesn't believe he is getting the care he needs" from his psychiatrist. (*Id.* at 859.) However, he denied psychological symptoms. (*Id.* at 862.) His primary care physician stated that he would contact the psychiatrist but directed Claimant to continue using his prescribed medications. (*Id.* at 864.)

At a follow-up appointment with his psychiatrist's nurse practitioner on March 8, 2018, Claimant told her that "he has not been able to use his CPAP like it was prescribed." (*Id.* at 841.) He also stated that his primary care physician had increased the dosage of the additional antidepressant the nurse practitioner had prescribed and "reports that he has not noticed any improvement in energy levels or alertness since starting [the medication], but has noticed a slight improvement in depression." (*Id.*) A mental status examination was normal aside from fair insight and judgment. (*Id.*) At his next appointment on April 12, 2018, Claimant reported that he was using his CPAP machine more often but complained that his prescribed medications were not helping his depression. (*Id.* at 850.) A mental status examination was again normal aside from fair insight and judgment. (*Id.*) The nurse practitioner changed Claimant's medication. (*Id.* at 850–51.)

On May 10, 2018, Claimant told the nurse practitioner that "he has not been able to tell a difference in his mood or level of depression" since starting the new medication and asked to switch back to the medication he had been using before. (*Id.* at 846.) He also reported that "he is using his CPAP 5-6 nights per week, for an average of 5 hours per night," but he "admits that he does not have a set sleep schedule and this often interfers [sic] with his total sleep and his quality of sleep." (*Id.*) The nurse practitioner approved Claimant's request to switch back to his old medication and prescribed a mood stabilizer.

(*Id.* at 847.) Claimant denied psychological symptoms at his appointment with his primary care physician on May 22, 2018. (*Id.* at 869.)

On June 28, 2018, Claimant presented to a new mental health provider to establish care, stating that "he didn't feel he was getting enough psychological support from [his old psychiatrist], but rather it was more focused on frequent medication changes." (*Id.* at 942.) Upon mental status examination, the physician's assistant noted that Claimant described his mood as "solemn" and had a congruent affect, and his "thought process is circumstantial." (*Id.* at 943.) Claimant was instructed to continue his prescribed medications and was prescribed an additional medication. (*Id.*)

He next returned to the physician's assistant on August 3, 2018, and reported that he tolerated his medications well, but there was no "improvement in mood." (*Id.* at 939.) He also stated that he had been attending group therapy. (*Id.*) Upon mental status examination, the physician's assistant observed that Claimant had an irritable mood and blunted affect. (*Id.*) She directed him to continue using his medications and increased the dosage of the additional medication she had prescribed. (*Id.*) He saw a psychiatrist at the same facility on August 31, 2018, and reported that "[h]e does not see significant change with medications [sic] changes made at last visit." (*Id.* at 986.) A mental status examination was normal. (*Id.*) Claimant was directed to continue his medications as prescribed. (*Id.*)

On October 26, 2018, Claimant returned to the psychiatrist and reported that he "has had little relief of his pain and struggles with frustration and hopelessness." (*Id.* at 1156.) He complained that "[h]e isn't sure what the medications [the psychiatrist] give[s] are supposed to be doing for him." (*Id.*) A mental status examination was normal. (*Id.*) Claimant was directed to continue his prescribed medications. (*Id.*) At his next

appointment with the psychiatrist on January 18, 2019, a mental status examination was again normal. (*Id.* at 1159.) The psychiatrist increased the dosage of one of Claimant's medications. (*Id.*) When Claimant next presented to the psychiatrist on April 12, 2019, he reported that he "has not seen any real improvement with higher dose" of his medication. (*Id.* at 1162.) Upon mental status examination, the psychiatrist observed that Claimant had a depressed mood with congruent affect. (*Id.*) Still, Claimant was directed to continue his medications as prescribed. (*Id.* at 1163.)

    2. *Consultative Psychological Examination: Katherine Marshall, M.S.*

Licensed psychologist Katherine Marshall, M.S. performed a consultative psychological examination of Claimant on September 22, 2017. (*Id.* at 707–12.) When reporting his chief complaints to the consultative examiner, Claimant stated that his medications for his spinal condition "cause problems with focus and concentration" and related that he had "trouble remembering how to get to doctors' offices." (*Id.* at 708.) He also reported that his primary care physician prescribed him medication to treat his depression, but he stated that he didn't "know if the medication is helping" because he was "still mopey and depressed." (*Id.*) He also reported anxiety symptoms. (*Id.*) The consultative examiner noted that Claimant reported presenting symptoms of sadness, loss of interest in activities, psychomotor agitation, tiredness, insomnia, inability to concentrate, suicidal ideation, uncontrollable anxiety, agitation, irritability, restlessness, and impaired social functioning. (*Id.* at 708–09.)

Upon mental status examination, the consultative examiner observed that Claimant "presented with appropriate attire and hygiene" but "looks older than stated age" and "appeared to be in pain that sometimes took his breathe [sic] away." (*Id.* at 710.) She observed that Claimant was cooperative and made eye contact, but she noted that his

7

speech was "circumstantial but understandable," and "[h]e frequently lost the point of what he was trying to say." (*Id.*) The consultative examiner noted that Claimant was fully oriented and had a depressed mood with congruent affect. (*Id.*) His thought processes "were circumstantial and not always logical or coherent," but his thought content "did not suggest any evidence of obsessions or behavioral compulsions," and "[t]here was no evidence of unusual perceptual experiences." (*Id.*) Claimant "denied any history of auditory or visual hallucinations" and suicidal or homicidal ideation. (*Id.*) The consultative examiner rated his judgment and insight as average. (*Id.*) She observed that his "[p]sychomotor behavior was agitated due to inability to get comfortable." (*Id.* at 711.) She rated his immediate and remote memory as average but his recent memory as "mildly impaired." (*Id.*) She noted no difficulties with Claimant's concentration, persistence, or pace. (*Id.*) The consultative examiner observed that his social functioning during the evaluation "was mildly impaired by [his] psychomotor agitation and circumstantial speech" and noted that "[h]e volunteered way too much irrelevant information" but "was friendly and cooperative." (*Id.*)

The consultative examiner diagnosed Claimant with moderate recurrent major depressive disorder based on his reported symptoms of sadness, loss of interest in activities, psychomotor agitation, tiredness, insomnia, difficulty concentrating, and "fleeting recurrent suicidal ideation." (*Id.*) She noted that his symptoms "have persisted for more than 6 months and are not attributable to the effects of a substance" and "interfere with social functioning." (*Id.*) She also diagnosed Claimant with generalized anxiety disorder based on his reported symptoms of anxiousness, uncontrollable anxiety, agitation, irritability, difficulty concentrating, restlessness, "less than satisfactory sleep," "significant distress," and impaired social functioning. (*Id.*) She noted that his symptoms

"are not attributable to the effects of a substance" and "have persisted for greater than 6 months." (*Id.*)

When describing Claimant's self-reported social functioning, the consultative examiner stated that Claimant "goes to the store once a month but just sits in the car" and never goes out to eat, visits family or friends, goes to the mall, exercises, or attends church. (*Id.*) She noted that Claimant "uses the phone as necessary" and "keeps medical appointments" and that "[h]e used to do a lot of things on the computer but doesn't really use computer much now." (*Id.*) She also noted that Claimant pays his bills using money his parents send him. (*Id.* at 711–12.) When describing Claimant's daily activities, the consultative examiner stated that Claimant wakes up around eight each morning and goes to bed between midnight and 3:00 a.m. (*Id.* at 712.) She stated that "he is independent in personal grooming and showers every 3 to 4 days" but "sometimes has to have help tying shoes and getting in and out of a vehicle." (*Id.*) She noted that he reported "washing a few dishes and occasionally sweeping something up out of the floor," mowing his grass with a riding lawnmower, and caring for his pets. (*Id.*) The consultative examiner also related that on a typical day, Claimant wakes up in the morning, gets dressed, eats breakfast, and takes his medications, eats lunch and watches television in the afternoon, and eats dinner, watches television, takes his medication, and eats a snack before going to sleep. (*Id.*) She stated that he "is capable of managing monetary benefits to which he may be entitled." (*Id.*)

C. *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

9

than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special

technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her

12

"not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through December 31, 2018. (Tr. at 22.) He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of his disability. (*Id.*) He found that Claimant's obesity, diabetes mellitus, lumbar and cervical degenerative disc disease, peripheral neuropathy with contracted toe deformity, obstructive sleep apnea, hearing loss, and status-post fracture of left humerus and surgical repair constituted "severe" impairments. (*Id.*) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 24.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform sedentary work . . . with additional limitations." (*Id.* at 25.) Specifically, he found that Claimant can lift, carry, push, and pull ten pounds occasionally and less than ten pounds frequently and can sit for six hours each day and stand or walk for up to two hours. (*Id.*) He further found that Claimant can frequently reach in all directions with his left arm, occasionally climb ramps and stairs, balance, stoop, and kneel, and never climb ladders, ropes, or scaffolds, crouch, or crawl. (*Id.*) In addition, the ALJ determined that Claimant should never work at unprotected heights or with heavy or hazardous machinery, could occasionally operate a motor vehicle, and could tolerate frequent exposure to extreme cold, occasional exposure to vibration, and moderate noise. (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, he was able to perform his past work as a call center representative "as generally and actually

performed." (*Id.* at 29–30.) As a result, the ALJ determined that Claimant was not "under a disability . . . from January 25, 2017, through the date of this decision." (*Id.* at 30.)

## II.   LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.   ANALYSIS

Claimant argues that the ALJ erred by failing to include mental functional limitations in his RFC assessment. (ECF No. 15 at 5–9.) He asks this Court to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 9.) The

14

Commissioner responds that the ALJ properly determined that Claimant's mental impairments did not result in work-related functional limitations. (ECF No. 16 at 9–11.) Claimant replies that the Commissioner's argument is "a distortion of [his] own regulatory policy" because he "conflates non-severity with no functional limitations." (ECF No. 17.)

"In the RFC assessment, the ALJ uses all relevant evidence, medical or otherwise, to determine a claimant's 'ability to meet the physical, mental, sensory, and other requirements of work.'" *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018) (quoting 20 C.F.R. §§ 404.1545, 416.945). The ALJ's decision "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). Stated another way, "the ALJ must both identify evidence that supports his conclusion and 'build an accurate and logical bridge from [that] evidence to his conclusion.'" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis deleted) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)).

The ALJ in this case made clear that Claimant did not require mental restrictions on his ability to work, and he explained his reasoning for reaching that conclusion. Although he correctly noted that his evaluation of the "Paragraph B" criteria as part of his application of the special psychiatric review technique at the second step of the sequential evaluation process is not equivalent to a mental RFC assessment, SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996), he stated that his RFC assessment "reflects the degree of limitation [he] has found in the 'paragraph B' mental function analysis." (Tr. at 23–24.)

15

And he essentially performed that RFC assessment as it relates to Claimant's mental impairments as part of his discussion of the "Paragraph B" criteria. (*Id.*)

Specifically, the ALJ noted that Claimant "alleges having depression and anxiety and receiving prescriptions for psychotropic medications" and "described problems with completing tasks, concentration, and general cognitive functioning." (*Id.* at 23.) But he observed that despite Claimant's "diagnoses for depressive disorder and anxiety disorder for which he was prescribed psychotropic medications . . . the medical evidence shows no significant deficits in long-term memory, short-term memory, concentration, or attention." (*Id.*) The ALJ noted that Claimant "exhibited some objective signs of anxiousness" but "repeatedly displayed an appropriate mood and affect without signs of abnormal thought content or delusions" and "exhibited a normal and cooperative behavior without signs of speech abnormalities" or "psychomotor retardation." (*Id.*) He further noted that "the record indicates symptom control with medication management." (*Id.*) The existence of Claimant's mental impairments "and [his] reports of some functional difficulties" led the ALJ to conclude that he "has mild limitations in all four 'paragraph B' mental functioning criteria." (*Id.*) However, the ALJ expressly stated that Claimant did not have "any work-related mental limitations." (*Id.*) He agreed with the opinions of the state-agency psychological consultants that Claimant's mental impairments were not severe and he did not require mental restrictions in the RFC assessment. (*Id.*)

Put simply, contrary to Claimant's assertion, mental limitations identified using the psychiatric review technique do not necessarily indicate work-related functional limitations that must be present in the RFC assessment. *Mascio*, 780 F.3d at 638 (explaining that claimant's "moderate limitation in concentration, persistence, or pace at

16

step three" may not "affect [her] ability to work" and thus "does not translate into a limitation in [her RFC]"); *see Hughes v. Astrue*, No. 1:09-cv-459, 2011 WL 4459097, at *10 (W.D.N.C. Sept. 26, 2011) ("[T]he ALJ's finding that [claimant's] panic disorder without agoraphobia and generalized anxiety were severe impairments at step two did not necessarily require the ALJ to include the limitations from such impairments in his analysis at step four."). This is true even if a job requires certain skills or is "extremely socially intensive," as Claimant argues. (ECF No. 15 at 8; ECF No. 17 at 4–5.) A claimant's RFC represents "the most [he] can still do despite [his] limitations" in any work environment, regardless of the particular skills required. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

"[A]lthough some consideration [of the effects of the claimant's non-severe impairments] is required [in the RFC assessment], there is no requirement that the RFC reflect a claimant's non-severe impairments to the extent the ALJ reasonably determines such impairments do not actually create functional limitations on a claimant's ability to work." *Perry v. Colvin*, No. 2:15-cv-01145, 2016 WL 1183155, at *5 (S.D.W. Va. Mar. 28, 2016) (citing 20 C.F.R. § 404.1545(a)(1); *Presnell v. Colvin*, No. 1:12-cv-299-FDW, 2013 WL 4079214, at *4 (W.D.N.C. Aug. 13, 2013)). The ALJ's written decision in this case demonstrates that he considered the potential work-related functional limitations associated with Claimant's mental impairments, and ultimately he effectively adopted the state-agency psychological consultants' opinions that Claimant's mild limitations in each of the four functional areas did not require mental RFC restrictions. (Tr. at 23–24.) "[T]he testimony of a non-examining physician [like a state-agency consultant] can be relied upon when it is consistent with the record." *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986) (citing *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971)). The ALJ in this

case explained that the state-agency psychological consultants' opinions "are consistent with the lack of significant positive objective signs indicating a significantly diminished capacity to perform mental work-related activities." (Tr. at 23.) Claimant does not challenge the ALJ's evaluation of their opinions. (ECF Nos. 15, 17.) As such, the undersigned **FINDS** that the ALJ did not err by not including mental restrictions in his RFC assessment.

### IV. CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 15), **GRANT** the Commissioner's request to affirm his decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Copenhaver.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985);

*Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: June 2, 2021

Dwane L. Tinsley
United States Magistrate Judge